UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRANDY DENISE A., Plaintiff, v. FRANK BISIGNANO, Commissioner of Social Security, Defendant. | Case No. 3:25-CV-01077-GPC-BJW **ORDER AFFIRMING COMMISSIONER'S DECISION** **[Dkt No. 13.]** |

On April 29, 2025, Petitioner Brandy Denise A. ("Plaintiff") filed this action seeking judicial review of the Commissioner of Social Security's final decision denying her application for disability insurance benefits ("DIB") under Title II and supplemental security income under Title XVI of the Social Security Act ("the Act"). (Dkt. No. 1, Compl.) The action has been fully briefed. (Dkt. Nos. 13, 15, 17.) Having reviewed the parties' arguments, the record, and the applicable law, the Court AFFIRMS the Commissioner's decision.

**Procedural Background**

On January 7, 2019, Plaintiff first applied for disability insurance benefits pursuant to Title II and supplemental security income pursuant to Title XVI of the Act alleging a

disability onset date of December 15, 2018. (Dkt. No. 8, Administrative Record ("AR") 408.) Her applications were denied initially on May 22, 2019, and upon reconsideration on August 2, 2019. (AR 75-88; 102-16.) Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which took place telephonically on June 25, 2020 before ALJ Andrew Verne ("first ALJ"). (AR 363-98.) On August 5, 2020, the first ALJ issued an unfavorable decision finding Plaintiff was not disabled under the Act from December 15, 2018, through the date of the ALJ's decision. (AR 133-44.) He concluded that although Plaintiff could not perform her past relevant work, she could perform work that exists in significant numbers in the national economy. (*Id.*) The Appeals Council denied Plaintiff's request for review on March 25, 2021. (AR 149-53.) On May 24, 2021, Plaintiff filed an action in district court seeking judicial review of the Commissioner's decision. (Case No. 3:21-CV-00981-KSC, Dkt. No. 1.) Both parties consented to Magistrate Judge jurisdiction for all purposes. (*Id.*, Dkt. No. 4.) After full briefing by the parties, (*id.*, Dkt. Nos. 11, 14, 15), on October 19, 2022, Magistrate Judge Karen S. Crawford issued an order denying Plaintiff's request for a reversal and granting Defendant's request for affirmance of the Commissioner's final decision. (*Id.*, Dkt. No. 16.)

On June 29, 2022, Plaintiff submitted a second application for disability insurance benefits pursuant to Title II and supplemental security income under Title XVI of the Act alleging a disability onset date of October 6, 2021. (AR 410-11.) Both applications were denied initially and upon reconsideration. (AR 155-72, 173-98.) On March 12, 2023, Plaintiff requested a hearing before an ALJ. (AR 315-16.) ALJ James Delphy ("second ALJ") held a telephonic hearing on December 12, 2023. (AR 43-73.) On May 9, 2024, the ALJ Delphy issued an unfavorable decision finding that Plaintiff was not disabled from October 6, 2021 through the date of the decision. (AR 17-36.) On April 14, 2025, the Appeals Council affirmed the decision. (AR 1-3.) On April 29, 2025, Plaintiff filed a

complaint in this Court for judicial review of the Commissioner's final decision. (Dkt. No. 1, Compl.)

**Factual Background**

Plaintiff, a resident of Oceanside, California, was born on November 6, 1991, and was almost 30 years old at the time of the onset of disability on October 6, 2021, and her highest education is two years of college. (AR 546, 559.) She has past relevant work as a cashier and waitress. (AR 546.) She claims she is unable to work due to her medical condition of endometriosis, depression, obsessive-compulsive disorder ("OCD") and attention-deficit hyperactivity disorder ("ADHD"). (AR 545.)

**A. Medical History**

**1. Treating Physicians' Medical Records**

Plaintiff was diagnosed with endometriosis and ovarian cysts in 2015, (Dkt. No. 9, Administrative Record ("2AR") 4283), and has had a long history of severe abdominal pain and nausea/vomiting. In 2015, she had laparoscopic surgery for "left ovarian cystectomy" but the procedure was "switched to open due to extensive disease and scar tissue." (AR 661.) In 2016, she had another "open" cystectomy surgery for removal of left ovarian cyst. (AR 661.) In 2020, she had laparoscopy with extensive lysis of abdominal and pelvic adhesions. (2AR 2307.) She was expected to have another diagnostic laparoscopy in August 2023 but chose not to proceed due to concerns it would not alleviate her pelvic pain. (2AR 2307.)

The available record indicates that Plaintiff began seeking medical treatment at North County Health Services and at the Emergency Department at Tri-City Medical Center in January 2018 for lower back pain, lower abdominal pain, nausea and tingling, numbness and weakness in her left leg. (AR 582-690.) These medical records from January 2018 to June 2020 are recited in Magistrate Judge Crawford's order dated October 19, 2022. (Case No. 3:21-CV-00981-KSC, Dkt. No. 16.) For purposes of this

case, the Court recites the medical records from Plaintiff's alleged onset of disability on October 6, 2021.

On November 27, 2021, Plaintiff visited the emergency department at Tri-City Medical Center due to abdominal pain in the right lower quadrant that radiated to the lower back and down her legs as well as nausea. (2AR 4290.) It was noted that her pain was typical of endometriosis and the physician did not suspect ovarian torsion. (AR 4291.) A CT scan showed no acute process which the doctor noted was not surprising due to her history of endometriosis, and a pelvic ultrasound showed a 3.1 cm complex right ovarian cyst that was likely increasing her pain. (2AR 4291-92.) She was treated with opiates and discharged the same day. (2AR 4291-92.)

From March 18, 2022, through April 5, 2022, Plaintiff was admitted to University of California, San Diego Health ("UCSD Health") for generalized abdominal pain and hypokalemia. (AR 1624, 1609, 1624.) Plaintiff originally presented to the hospital due to daily vomiting, diffuse joint pains, and twenty-pound weight loss. (AR 1615-22.) She explained that she had pain in her lower abdomen, lower back, bilateral lower extremities and joint pain for the past two years but the pain has worsened the past two months and her pain was described as sharp and stabbing with spasms. (AR 1633.) A CT scan was performed on March 18, 2022 and revealed Plaintiff has a mild bilateral hydrosalpinx, which was "likely related to [her] known history of endometriosis." (AR 1629.)

On March 21, 2022, while hospitalized, Dr. Aaron Arthur Meyer, M.D., performed a psychiatry consultation of Plaintiff for her anxiety. (AR 1652-56.) Dr. Meyer reported Plaintiff's thought process was logical and her insight and judgment were fair. (AR 1654.) He also noted that Plaintiff denied any suicidal ideation and denied any auditory and visual hallucinations. (AR 1654.) In all, Dr. Meyer suspected Plaintiff's "anxiety and pain positively reinforce each other," and diagnosed her with unspecified mood disorder and suspected it is secondary to her general medical condition and ruled out

major depressive disorder. (AR 1655.) He recommended "augmenting with psychotropics." (AR 1655.)

On March 22, 2022, Plaintiff underwent a physical therapy evaluation for fall prevention after Plaintiff reported three recent falls when her legs gave out while walking. (AR 1671.) During the exam, Plaintiff used a front wheeled walker for short distances and wheelchair for longer distance mobility. (AR 1672.) The discharge notes recommended a walker to enhance Plaintiff's safety and mobility. (AR 1675.) Subsequently on March 26, 2022, Plaintiff was observed ambulating independently in her room. (AR 1710.) Then, on March 28, 2022, at her daily physical therapy treatment, she did not use any device for ambulation and was able to walk around the room with minimal assistance. (AR 1726-27.) After continuing hospital treatment, Plaintiff neared her functional baseline, could ambulate without an assistive device, and did not need skilled inpatient physical therapy. (AR 1781.) Upon discharge, she was instructed to follow her prescribed mobility precautions and to continue to use an assistive device as instructed when walking to improve stability and prevent falls and recommended supervision with walking to enhance safety. (AR 1782.)

On April 3, 2022, during the same hospitalization, Dr. Xia Li, M.D., performed another psychiatry consultation of Plaintiff after the social worker reported that her mood changed rapidly from very calm and pleasant to very angry and screaming and she was cutting herself with forks on her wrists. (AR 1771.) At the examination, Plaintiff was calm, cooperative, engaged with good eye contact, her mood was "fine" and she had logical thought process. (AR 1773.) Plaintiff denied any suicidal and homicidal ideation and denied auditory and visual hallucinations. (AR 1773.) Dr. Li assessed her with an unspecified mood disorder and anxiety ruling out OCD, and recommended she continue taking medications for anxiety. (AR 1773-74.)

In April 2022, an MRI scan of Plaintiff's pelvis was without obvious cause for pain besides fluid retention, (AR 1786), but did present with a hematosalpinx on the left, hydrosalpinx on the right, and hyperintensity along the posterior aspect of the uterus, which is compatible with endometriosis, (AR 1788). Additionally, Plaintiff reported some relief from vomiting with use of marijuana, (AR 1615), and that she had been smoking marijuana a few days a week for two years, (AR 1621.) Another report states that she smoked marijuana daily. (AR 1628.) An intake assessment commented that Plaintiff's nausea and vomiting were possibly due to cannabis hyperemesis. (AR 1621.) Plaintiff reported neither taking her iron pills for her chronic anemia, nor the prescribed medication for her depression and anxiety. (AR 1644.)

Dr. Jonathan Stewart McIntyre, M.D. reviewed Plaintiff's symptoms before discharge and reported Plaintiff had better control of her pain and nausea. (AR 1784.) Dr. McIntyre opined that he "suspects a lot of [Plaintiff's] symptoms are psychosomatic and she will need intense outpatient psychiatric care." (AR 1786.) Plaintiff reported anxiety attacks since 2015 when she was diagnosed with endometriosis but was not on chronic benzodiazepines and not receiving outpatient psychiatric care. (AR 1786.) Upon discharge, she was prescribed a number of medications for her conditions. (AR 1794.)

On April 8, 2022, Plaintiff was taken to the Emergency Department at Tri-City Medical Center by ambulance for severe abdominal pain radiating to the lower back, and nausea/vomiting, and after significant improvement with her symptoms, she was discharged the same day. (2AR 4280, 4283, 4287.) During the visit, she requested to speak with a psychiatrist. (2AR 4284.) At the psychiatric evaluation, she stated she was not suicidal but then later said she was not sure. (2AR 4287.) Plaintiff started crying complaining that her endometriosis pain has been unbearable and asked for Dilaudid, a pain medication, throughout the session. (2AR 4287.) She denied any plan to harm herself. (2AR 4287.)

From April 11, 2022 to April 21, 2022, she was admitted to Tri-City Medical Center for abdominal pain, nausea and vomiting. (2AR 4254.) On April 20, 2022, Plaintiff expressed that she was feeling anxious about discharge and reported auditory and visual hallucinations earlier in the day which she attributed to poor sleep as she did not have a history of auditory and visual hallucinations or psychosis. (2AR 4267-68.) She denied current auditory and visual hallucinations, suicidal ideation, or homicidal ideation and had linear thought process. (2AR 4268.)

Then, on April 25, 2022, Plaintiff again went to the emergency department at Tri-City Medical Center for abdominal pain, nausea and vomiting and was admitted until discharged on June 1, 2022. (2AR 4228.) She remained hospitalized in order to avoid any lapse in her medications while she waited for a referral to UCSD pain management. (2AR 4229.) She received an appointment with UCSD pain management on June 2, 2022; therefore, she was discharged on June 1, 2022. (2AR 4229.)

On June 2, 2022, Plaintiff was seen by Dr. Rajiv Reddy, M.D., at the UCSD pain clinic, and reported "constant aching" pain in the pelvic area reporting a pain level of 10/10. (AR 1600.) The pain made it hard for her to walk, sleep, sit, work and exercise. (AR 1600.) While she tried ibuprofen, naproxen, hydrocodone, oxycodone, hydromorphone, tramadol, tapentadol, fentanyl, and codeine, Plaintiff stated none were helpful except hydromorphone. (AR 1600.) Dr. Reddy found that Plaintiff's multiple hospitalizations for abdominal and back pain were of "unclear etiology, possible related to known endometriosis." (AR 1602.) He also noted Plaintiff was partially responsive to opioid treatments and ambulated without assistance. (AR 1602.) He recommended a trial for long-acting opioid but did not recommend methadone. (AR 1603.)

An MRI on November 19, 2022 showed "deep infiltrating endometriosis with diffuse endometriosis lesions involving bilateral ovaries, posterior uterus, stable left hematosalpinx and stable right hydrosalpinx." (2AR 2307; *see also* 2AR 2312.) "The

right and left ovaries appear chronically tethered to each other and to the posterior uterine fundus with prominent uterine retroflexion." (2AR 2307.)

On February 12, 2023, Plaintiff was admitted to Scripps Memorial Hospital Encinitas Emergency Department for abdominal pain and nausea. (2AR 3283.) A CT scan of Plaintiff's abdomen and pelvis revealed ovarian cysts with the left greater than right and a 3.7 cm anterior uterine body fibroid. (2AR 3302-303.) Plaintiff was diagnosed with generalized abdominal pain acute and nausea and vomiting. (2AR 3304.) Though her history of endometriosis was noted, it was not included within the clinical impressions. (2AR 3304.) On March 9, 2023, Plaintiff returned to Scripps Memorial Hospital Encinitas Emergency Department for abdominal pain. (2AR 3191.) Dr. Omeed Saghafi, M.D. evaluated Plaintiff and noted her history of endometriosis could be causing her pain. (2AR 3212.) A CT scan revealed a fairly complex ovarian cyst, but an ultrasound did not reveal evidence of torsion or complexity. (2AR 3212.) Plaintiff was diagnosed with urinary tract infection, left ovary cyst, fibroid, and generalized abdominal pain. (2AR 3191.)

On March 23, 2023, Plaintiff was seen by Virginia Chambers, a licensed clinical social worker ("LCSW"). (AR 2143-46.) Plaintiff reported that her mental health was deteriorating to the point she could not handle her depression and anxiety and reported suicidal thoughts. (AR 2143.) She reported she held a knife in her hand a few weeks ago but did not kill herself after thinking about her family and had no suicidal ideation after that. (AR 2143.) She reported hearing noises, seeing shadows and hearing muffled phrases between people. (AR 2144.) During the visit, she did not have any suicidal ideations but reported she suffers from pain and has no motivation or energy to do anything. (AR 2144.) She was diagnosed with depressive disorder due to another medical condition with major depressive-like episode with psychosis and generalized anxiety disorder, recurrent and severe. (AR 2145.)

On April 7, 2023, Plaintiff was again seen at Scripps Memorial Hospital Encinitas Emergency Department for vomiting and abdominal pain. (2AR 3105, 3107.) Dr. Anthony Bryan Bisanz, M.D. examined Plaintiff and noted her arms presented with uncontrollable movements and that she was rocking back and forth in her chair. (2AR 3128.) Dr. Bisanz opined that Plaintiff's nausea is most likely multifactorial. (2AR 3129.) He pointed to suggestions of cannaboid hyperemesis syndrome because Plaintiff tested positive for THC, though noted Plaintiff previously had similar symptoms when she was not using cannabis. (2AR 3129.) Plaintiff was diagnosed with primary functional disorder of the intestine, drug-induced constipation, fallopian tube disorder, generalized abdominal pain, and gastritis without bleeding. (2AR 3130.)

On April 12, 2023, at a behavioral health visit, Plaintiff's mood was severely depressed and she had thoughts of wanting to harm herself but engaged in no self-harm behaviors. (AR 2124.) She was disheveled and was in poor general health but her eye contact was good, speech unremarkable, her affect was full range, she was alert with appropriate insight, had fair judgment and fully oriented. (AR 2129.) She had thoughts to harm others but denied any plans or intentions to harm others. (AR 2124.) She reported auditory hallucinations of commands, hearing her name called or repeated phrases and visual hallucinations of shadows and people. (AR 2124.) These hallucinations occurred throughout the day but not often. (AR 2124.)

From May 2, 2023, through May 3, 2023, Plaintiff returned to Scripps Memorial Hospital Encinitas with a chief complaint of ongoing vomiting lasting three days. (2AR 2946-947.) Dr. Steven Ronald Andree, M.D., treated Plaintiff and noted her history of stage IV endometriosis and that she was on her menstrual period at the time of hospitalization. (2AR 2969.) After an examination and a review of Plaintiff's medical records, Dr. Andree found results "suggestive of an acute exacerbation of her chronic abdominal pain possibly related to endometriosis." (2AR 2974.) Dr. Andree also

suspected "a component of opiate withdrawal given [Plaintiff's] diaphoresis." (2AR 2974.) Additionally, a CT scan of Plaintiff's abdomen and pelvis demonstrated no evidence of acute pathology other than small mildly complex cystic changes on the left ovary, which may reflect Plaintiff's history of endometriosis. (2AR 2974, 2981.) Laboratory studies also demonstrated acute kidney injury, leukocytosis, and mild metabolic acidosis. (2AR 2974.) As a result, Dr. Andree diagnosed Plaintiff with intractable nausea and vomiting, as well as acute kidney injury. (2AR 2974.) Plaintiff's active problem list also included endometriosis and marijuana use. (2AR 2981.) She was counseled on marijuana cessation as it impacts her cyclical vomiting and nausea. (2AR 2981.)

From June 4, 2023, through June 13, 2023, Plaintiff was again hospitalized at Scripps Memorial Hospital Encinitas. Plaintiff's diagnoses included: nausea and vomiting, endometriosis, and marijuana use. (2AR 2860.) She was treated with occupational therapy and physical therapy. (*See* 2AR 2823-2828; 2828-32; 2840-43.)

From August 21, 2023, through August 26, 2023, Plaintiff was hospitalized at Scripps Memorial Hospital Encinitas Emergency Department and treated for recurrent abdominal pain, back pain, and leg pain. (2AR 3362-63.) Plaintiff's problem list included endometriosis, leiomyoma of her uterus, irritable bowel syndrome, and chronic pelvic pain. (2AR 3391.) Of these problems, the only active issue requiring follow up care included abdominal pain. (2AR 3391.) Plaintiff began menstruating about three days before admission to the emergency department and reported that was when her abdominal pain became more severe. (2AR 3405.) The pain was concentrated primarily on the left lower abdomen and did not radiate elsewhere. (2AR 3405.) Regarding Plaintiff's endometriosis, her abdominal exam and CT scan were unchanged from prior exams and did not raise concerns for new pathology. (2AR 3392.) Her pain was treated with oral Dilaudid and Zofran and her symptoms significantly improved over the course

of hospitalization. (2AR 3392.) Further, Plaintiff received oral nutrition supplements which helped her nausea and abdominal pain. (2AR 3427.) Plaintiff's urine toxicology was positive for THC and she admitted to infrequently taking edible THC because she thought only smoking would cause cyclic vomiting. (2AR 3433.) On August 25, 2023, during Plaintiff's hospital admission, Catherine T. Culver, O.T., completed an occupational therapy treatment and examination of Plaintiff. (2AR 3419-21.) Ms. Culver noted Plaintiff's precautions of a fall risk resulting from her acute abdominal pain. (2AR 3419.) It was recommended that Plaintiff use a walker on a short-term basis until her functional goals were met. (2AR 3420-22.)

From October 2, 2023, through October 10, 2023, Plaintiff was admitted to UCSD Health's Emergency Department for endometriosis pain flare and uncontrolled nausea and vomiting. (2AR 2297-493.) She reported her endometriosis pain was well controlled until recently and the last time she suffered this much pain was in 2015 prior to her cystectomy although she admitted she is never pain free. (2AR 2307.) According to Plaintiff's gastrointestinal consultation, much of her nausea and vomiting related to her underlying endometriosis flare, "which will hopefully improve with time given resolution of flare." (2AR 2298.) In fact, Plaintiff reported her symptoms improved during her hospital treatment and she returned to baseline pain levels by discharge. (2AR 2298, 2300.) Additionally, Plaintiff's labs and imaging presented no noted abnormalities. (2AR 2298.) Dr. Ashley Lopez, M.D. performed an ultrasound of Plaintiff's transabdominal and found no sonographic evidence of right ovarian torsion. (2AR 2297.) A chronic pain service consultation found that Plaintiff's history of endometriosis was still a cause of significant nausea with no vomiting. (2AR 2299.) However, Plaintiff did not present signs of uncontrolled pain. (2AR 2299.) Further, while an osteopathic structural/somatic dysfunction exam revealed whole body postural strain, somatic

dysfunction, and decompensation, the results were likely a "byproduct of chronic postural decompensation superimposed by prolonged bed rest." (2AR 2299.)

Plaintiff reported visual and auditory hallucinations the night she was admitted. (2AR 2325.) Upon psychiatric examination, she stated that she has had prior bouts of sporadic visual and auditory hallucinations. (2AR 2325.) She explained that as a child she had conversations with an imaginary friend but as an adult she had sporadic bouts of seeing figures moving around her room when she laid down and reported she engaged with the visual hallucinations or carried out conversations with people who are not there. (2AR 2325.) She reported that she has not had any prior episodes of acting under the influence of those voices to harm herself or others. (2AR 2325.) She explained that her psychotic symptoms got worse when she was admitted to the hospital. (2AR 2325.) She also admitted she was not on any psychotropic medications. (2AR 2326.) On October 10, 2022, she underwent another psychiatry consultation where she endorsed ongoing hallucinations and paranoia while in the hospital which was worse at the beginning of the hospitalization. (2AR 2298, 2301.) Despite this, no safety concerns were noted, and Plaintiff was reported to cope well with medical stressors in the hospital. (2AR 2298.)

**2. Examining State Agency Consultants**

On February 2, 2023, an internal medicine consultation was performed due to history of endometriosis diagnosed in 2015 on Plaintiff by Dr. Seung Ha Lim, M.D., the consultative examiner. (AR 2082-85.) During the examination, Dr. Lim found that Plaintiff was well-developed and well-nourished with no acute distress. (AR 2083.) Plaintiff had mild lower abdominal tenderness with palpation. (AR 2084.) Her range of motion of the joints of the upper and lower extremities were within normal limits, and she had normal muscle bulk and tone without atrophy. (AR 2084.) Her grip strength by Jamar Dynamometer on her right hand generated 40 pounds of force and her left hand generated 30 pounds. (AR 2083.) In his review, Dr. Lim noted that Plaintiff had a

normal gait and did not require the use of assistive devices for ambulation at the time of examination. (AR 2083, 2085.) Dr. Lim concluded that Plaintiff is "restricted to standing and/or walking about 6 hours in an eight-hour workday with appropriate breaks", could "sit for 6 hours in an eight-hour day with appropriate breaks", and could "lift and/or carry 50 pounds occasionally and 25 pounds frequently." (AR 2085.) He also noted that she "has postural limitations such as frequent stooping." (AR 2085.)

**3. Vocational Expert Testimony**

At Plaintiff's first ALJ hearing, Vocational Expert ("VE") Steven Davis testified as to what jobs Plaintiff could perform given her limitations. (AR 390-96.) He characterized Plaintiff's most recent job as a cashier II at the light exertion level, performed at medium, with a Specific Vocational Preparation ("SVP") of 2, and as a waitress at the light exertion level, performed at medium, with an SVP of 3. (AR 390.)

The first ALJ asked Mr. Davis if a hypothetical claimant would be able to perform that past work given limitations similar to Plaintiff's. (AR 394-95.) Mr. Davis responded that the ALJ's posed hypothetical limitations would rule out past work, thus leaving unskilled work options. (AR 395.) Then, the first ALJ asked Mr. Davis about the types of unskilled jobs to which the ALJ's posed limitations would transfer. (AR 395.) Mr. Davis offered (1) laminator at the sedentary level with an SVP of 2 and 66,100 jobs available; (2) table worker at the sedentary level with an SVP of 2 and 38,800 jobs available; and (3) assembler at the sedentary level with an SVP of 2 and 35,000 jobs available. (AR 395.)

Then, the first ALJ asked Mr. Davis if any work would be available if a hypothetical claimant with limitations similar to Plaintiff's were off task fifteen percent or more during the workday on a consistent basis. (AR 395.) Mr. Davis responded that there would not be. (AR 395.) The first ALJ also asked Mr. Davis if any work would be available if a hypothetical claimant with limitations similar to Plaintiff's took extra

breaks, like two or more ten-minute or more breaks, during the workday or missed two or more days consistently a month. (AR 395-96.) Mr. Davis again responded that there would not be work available. (AR 395-96.)

At Plaintiff's second ALJ hearing, VE Shelley Cochlin was available to testify as to what jobs Plaintiff could perform given her limitations. (AR 43-73.) However, the second ALJ did not call on Ms. Cochlin to testify because the first ALJ hearing already covered the relevant information. (AR 50-51.) The second ALJ asked Plaintiff's counsel, who was also present at the first ALJ hearing, if the work history in the prior ALJ's decision remains accurate. (AR 50.) Plaintiff's counsel responded that it was correct. (AR 50.)

**B. The ALJ's Decision**

For the purposes of the Social Security Act, a claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). In order to determine whether a claimant meets this definition, the ALJ employs a five-step sequential evaluation. 20 C.F.R. § 404.1520(a); 20 C.F.R. § 416.920(a). If the ALJ determines that a claimant is either disabled or not disabled at a step in the process, the ALJ does not continue to the next step. *See* 20 C.F.R. § 404.1520(a); 20 C.F.R. § 416.920(a); *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009).

In brief, the ALJ considers whether the claimant is disabled by determining: (1) whether the claimant is "doing substantial gainful activity"; (2) whether the claimant has a "severe, medically determinable physical or mental impairment . . . or a combination of impairments that is severe" and that has lasted for more than 12 months; (3) whether the impairment "meets or equals" one of the listings in the regulations; (4) whether, given the

claimant's residual functional capacity ("RFC"), the claimant can still do his or her "past relevant work"; and (5) whether the claimant "can make an adjustment to other work." 20 C.F.R. § 404.1520(a)(4)(i)-(v); 20 C.F.R. § 416.920(a)(4)(i)-(v). Between steps three and four, the ALJ must, as an intermediate step, assess the claimant's RFC. *See* 20 C.F.R. § 404.1520(e); *Bray*, 554 F.3d at 1222–23; *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014). The burden of proof is on the claimant at steps one through four but shifts to the Commissioner at step five. *Bray*, 554 F.3d at 1222.

At step one, the second ALJ found that Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of October 6, 2021. (AR 20.) At step two, the ALJ determined Plaintiff's severe impairments included "obesity, anemia, endometriosis status-post cystectomy in 2015 and 2016, lysis adhesion, mood disorder, depression, and medical marijuana use." (AR 20-21.) At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" in the regulations. (AR 21-23.) Prior to step four, the second ALJ adopted the first ALJ's RFC determination that Plaintiff had the RFC to perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b)[1] except "she is able to lift, carry, push and pull 20 pounds occasionally and up to 10 pounds frequently; able to stand and/or walk 6 hours and sit 6 hours in a 8 hour workday with normal breaks; able to push and pull with the bilateral lower extremities; can occasionally able to climb ramps, stairs, ropes, ladders or scaffolds; can occasionally able to balance, stoop, kneel, crouch, and crawl; is limited to

---

[1] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. §§ 404.1567(b), 416.967(b).

understanding, remembering, and carrying out simple, routine, repetitive tasks, with breaks every two hours; cannot have interaction with the general public; can have occasional work-related, non-personal, non-social interaction with co-workers and supervisors involving no more than a brief exchange of information or hand-off of product; no fast-paced work; and can work in a low-stress environment where there are few workplace changes." (AR 23-24.) In adopting the first ALJ's RFC determination, the second ALJ found that Plaintiff had not rebutted the presumption of continuing non-disability by submitting any new or material evidence that would change her RFC. (AR 24.) He concluded that the current record confirms her severe medical impairments and her continued treatment of them. (AR 24.)

As such, at step four, the second ALJ relied on the first ALJ's decision to conclude that Plaintiff is not capable of performing her past relevant work as a Cashier II or Waitress. (AR 33-34.) At step five, the ALJ considered Plaintiff's age, 29 years old, her high school education, work experience and RFC and determined that Plaintiff could perform various jobs which exist in significant numbers in the national economy. (AR 34-35.) These included, for example, a laminator, a table worker, and an assembler. (*Id.*) The ALJ concluded that Plaintiff was not disabled at any time from the alleged onset date, October 6, 2021, through the date of the decision. (AR 35-36.)

## Discussion

### A. Standard of Review of Commissioner's Final Decision

Section 205(g) of the Social Security Act ("the Act") permits unsuccessful claimants to seek judicial review of the Commissioner's final agency decision. 42 U.S.C. § 405(g). The reviewing court may enter a judgment affirming, modifying, or reversing the Commissioner's decision, and may also remand the matter to the Commissioner of Social Security for further proceedings. *Id.*

The scope of the reviewing court is limited; it may only "set aside the ALJ's denial of benefits . . . when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007) (internal quotations omitted). "'Substantial evidence' means more than a mere scintilla, but less than a preponderance, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). However, "[w]here evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

**B. Res Judica Effect of the Prior ALJ's Decision**

The principles of res judicata apply to administrative proceedings although it applies "less rigidly" in administrative proceedings than in judicial proceedings. *Chavez v. Bowen*, 844 F.2d 691, 693 (9th Cir. 1988). If an ALJ finds that the claimant is not disabled in a prior final decision, then a presumption of non-disability arises in a subsequent social security claim involving the same parties, facts, and issues. *Id.*; Acquiescence Ruling 97-4(9) (Dec. 3, 1997).[2] In order for a claimant to "overcome the presumption of continuing nondisability arising from the first administrative law judge's findings of nondisability," a claimant "must prove 'changed circumstances' indicating a greater disability." *Chavez*, 844 F.2d at 693 (citing *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985)). Changed circumstances include an "increase in severity," "a change in the claimant's age category, as defined in the Medical-Vocational Guidelines," and new

[2] The Commissioner issues Acquiescence Rulings when circuit law conflicts with Agency policy. *See generally* Acquiescence Ruling 97-4(9) ("Statement as to How *Chavez* Differs from Social Security Policy"). Adopting *Chavez*, Acquiescence Ruling 97-4(9) "applies to cases involving a subsequent disability claim with an unadjudicated period arising under the same title of the Social Security Act as a prior claim on which there has been a final administrative decision that the claimant is not disabled." *Klemm v. Colvin*, No. EDCV 13-1717-OP, 2014 WL 2611447, at *1 (C.D. Cal. June 11, 2014).

issues raised by the claimant, "such as the existence of an impairment not considered" in a prior application. *Lester v. Chater*, 81 F.3d 821, 827 (9th Cir. 1995); Acquiescence Ruling 97-4(9), 1997 WL 742758, at *3 (Dec. 3, 1997) ("A claimant may rebut the presumption by showing a 'changed circumstance' affecting the issue of disability with respect to the unadjudicated period, e.g., a change in the claimant's age category under 20 C.F.R. § 404.1563 or § 416.963, an increase in the severity of the claimant's impairment(s), the alleged existence of an impairment(s) not previously considered, or a change in the criteria for determining disability."). Similarly, where the ALJ has found a claimant not disabled in a prior claim, findings concerning the claimant's RFC, education, and work experience are afforded some *res judicata* consideration and will not be disturbed in a subsequent disability claim, absent new and material evidence related to such findings. *Chavez*, 844 F.2d at 694.

Here, on January 7, 2019, Plaintiff filed her first application for disability insurance benefits under Title II and Title XVI of the Act alleging a disability onset date of December 15, 2018. (AR 408.) On August 5, 2020, the first ALJ issued an unfavorable decision finding Plaintiff was not disabled under the Act and assessed her RFC and concluded she could perform light work as defined in 20 CFR §§ 404.1567(b) and 416.967(b) except "she is able to lift, carry, push and pull 20 pounds occasionally and up to 10 pounds frequently; able to stand and/or walk 6 hours and sit 6 hours in a 8 hour workday with normal breaks; able to push and pull with the bilateral lower extremities; can occasionally able to climb ramps, stairs, ropes, ladders or scaffolds; can occasionally able to balance, stoop, kneel, crouch, and crawl; is limited to understanding, remembering, and carrying out simple, routine, repetitive tasks, with breaks every two hours; cannot have interaction with the general public; can have occasional work-related, non-personal, non-social interaction with co-workers and supervisors involving no more than a brief exchange of information or hand-off of product; no fast-paced work; and can

work in a low-stress environment where there are few workplace changes." (AR 137.) After the Appeals Council denied Plaintiff's request for review, (AR 149-53), Plaintiff filed an action seeking judicial review of the Commissioner's decision. (Case No. 3:21-CV-00981-KSC, Dkt. No. 1.) On October 19, 2022, Magistrate Judge Karen S. Crawford issued an order denying the Plaintiff's request for a reversal and granting the affirmance of the Commissioner's final decision. (*Brandy Denise A. v. Kijakazi*, Case No. 3:21-CV-00981-KSC, 2022 WL 22898308, at*16 (S.D. Cal. Oct. 19, 2022.)

Then, on June 29, 2022, Plaintiff filed another application for disability insurance benefits pursuant to Title II and Title XVI of the Act, alleging a disability onset date of October 6, 2021. (AR 410-11.) As such, the Plaintiff's complaint arises under the same titles of the Act as the prior claim on which there has been a final decision that the Plaintiff is not disabled. Accordingly, a presumption of continuing nondisability arises for the subsequent disability claim with respect to the unadjudicated period. *See Chavez*, 844 F.2d at 693. The second ALJ applied the *Chavez* presumption of non-disability and found Plaintiff had not rebutted the presumption of nondisability arising from the first ALJ's decision. (AR 17-18, 24.)

In her briefs, Plaintiff does not argue, acknowledge or address the res judicata effect of the prior ALJ's decision. But she claims that the medical evidence shows "further deterioration from the combination of endometriosis with mental instability, and chronic pain with lack of mobility" and "the ALJ failed to provide a meaningful review of the progression of Mr. Allen's impairments" suggesting her condition has increased in severity. (Dkt. No. 13 at 12.) Here, the Court applies *Chavez* and evaluates whether the Plaintiff has shown changed circumstances indicating a greater disability in order to rebut the presumption of non-disability adjudicated by the first ALJ's decision on August 5, 2020.

**C. Consideration of Impairments as to RFC**

Plaintiff contends that the second ALJ improperly evaluated her RFC by failing to address the "effect of the combination of physical of both physical and mental limitations together" as required by 20 C.F.R. § 404.1529(d).[3] (Dkt. No. 13 at 8-12.[4]) Specifically, she contends the ALJ failed to provide meaningful review of the progression of Plaintiff's impairments related to her chronic endometriosis, the need for a walk to ambulate and her mental deterioration with associated psychosis including auditory and visual hallucinations. (*Id.*) In response, Defendant argues that the ALJ properly considered Plaintiff's impairments along with the medical evidence and reasonably concluded that Plaintiff had not submitted any new and material evidence which would change the RFC assessed by the first ALJ. (Dkt. No. 15 at 2-4.)

An RFC assesses "an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis" meaning eight hours a day for five day per week. Assessing Residual Functional Capacity in Initial Claims, SSR 96-8p, 1996 WL 374184, at *1 (S.S.A. July 2, 1996). It is the most an individual can do despite their limitations." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). As to assessing an RFC, the Commissioner must consider all of the claimant's medically determinable impairments. 20 C.F.R. §§ 404.1545(a)(2); 416.945(a)(2). Further, "an ALJ must consider all relevant evidence in the record, including, *inter alia*, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006) (internal quotation marks and citations omitted); *see also* 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).

---

[3] 20 C.F.R. § 404.1529(d) concerns consideration of symptoms in the disability determination process and not specifically to RFC.

[4] Page numbers are based on the CM/ECF pagination.

Ultimately, the "ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence." *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008) (citing *Andrews v. Shalala*, 53 F.3d 1035, 1039-40 (9th Cir. 1995)) ("The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities."). However, an ALJ may not "cherry pick" evidence without considering its context in the record. *Ghanim v. Colvin*, 763 F.3d 1154, 1164 (9th Cir. 2014); *Garrison*, 759 F.3d at 1017 n.23 (ALJ may not "cherry-pick" from mixed results to support a denial); *Holohan v. Massanari*, 246 F.3d 1195, 1207 (9th Cir. 2001) (holding that the ALJ erred in selectively relying on entries in the medical record while "ignor[ing] the many others that indicated continued, severe impairment").

Here, the second ALJ found Plaintiff had not rebutted the presumption of nondisability arising from the first ALJ's decision. (AR 17-18.) In coming to that determination, the ALJ referenced record evidence concerning Plaintiff's physical and mental limitations and provided a detailed and lengthy review of her medical and subjective pain testimony including her chronic endometriosis, whether she required a walker for ambulation and her mental condition, including her auditory and visual hallucinations. (AR 23-32.)

**1. Chronic Endometriosis**

The ALJ considered Plaintiff's endometriosis status-post cystectomy in 2015 and 2016, as well as her lysis adhesion. (AR 25-27.) He recognized that she had a "significant history of emergency care treatment for abdominal pain due to endometriosis and ovarian cysts with intermittent back pain radiating to the left leg as well as intractable nausea with vomiting." (AR 25.) Despite this, he noted that physical examination findings have been benign. (AR 25.)

The ALJ considered her ER visit on November 27, 2021 where Plaintiff presented with on and off 7/10 abdominal pain in her right and left lower quadrant with pain that

radiated to the lower back and down her back as well as nausea. (2AR 4290.) As to diagnostic testing on November 27, 2021, a CT scan showed no definitive evidence of acute process in the abdomen or pelvis, (2AR 4293) and "probable right ovarian visualized follicles versus cysts" and a pelvic ultrasound showed complex right ovarian cyst most compatible with hemorrhagic that is likely increasing her pain. (2AR 4292, 4294.) She was discharged the same day after her symptoms subsided and prescribed Toradol, Protonix and Zofran for her persistent nausea vomiting. (2AR 4290-92.)

The ALJ considered her ER hospitalization from March 18, 2022 to April 5, 2022, providing details as to her symptoms and medical treatment. (AR 1615-17.) According to an examination, she had abdominal tenderness but no guarding and normal range of cervical and thoracic and lumbar motion. (AR 1619.) Plaintiff reported nausea/vomiting possibly due to cannabis hyperemesis, and smoking marijuana a few days a week for two years. (AR 1621.) She was not taking nortriptyline 25 mg nightly for her anxiety. (AR 1621.)

He also commented and provided details as to her visit to the emergency department on three occasions in April 2022 and noted that when she was discharged on June 1, 2022, her symptoms improved and she was referred to UCSD pain management. (AR 26.) The ALJ also recognized that in 2023, Plaintiff sought emergency care treatment nine times "due to her abdominal pain, lower back pain, nausea, and/or vomiting with the inability to hold oral fluids or nutrition including prescribed medications." (AR 26.) However, he noted that in half of these visits, she was discharged the same or the next day when her symptoms improved. (AR 26.) Despite these numerous ER visits, her physical exams were unremarkable and diagnostic studies were generally unremarkable except for her existing endometriosis, ovarian cysts, fibroids with no evidence of ovarian torsion. (AR 26.) Her course of treatment during hospital admission involved opioid pain medications. (AR 26-27.) The ALJ considered

the long history of treatment, ER visits and hospitalizations for her severe abdominal pain due to endometriosis and nausea/vomiting and low back pain in assessing her RFC.

**2. Mental Health**

As to Plaintiff's mental health, the ALJ addressed in detail the psychosomatic component of Plaintiff's behavioral symptoms in 2022. (AR 27.) Then, he recounted in detail her claimed symptoms of mood disorder and depression and her history of psychiatric treatment. (AR 28-29.) He also considered Plaintiff's reported auditory and visual hallucinations during an ER visit resulting in hospitalization in October 2023. (AR 29.) But during those visits, the examinations were unremarkable and she was cooperative, forthcoming, able to establish rapport, alert and oriented, was coherent and had logical thought process with fair insight and judgment. (2AR 2325-26.) He also evaluated a number of psychiatric reports from March 31, 2021 through October 23, 2023, (AR 2110, 2270; 2AR 2283, 2327, 4144, 4251), where Plaintiff expressed suicidal ideation, some homicidal ideation and hallucinations but she denied these symptoms during exams. (AR 31.)

Plaintiff highlights one report by Virgina Chambers, LCSW, dated March 23, 2023, where Plaintiff reported that she held a knife in her hand really hard and separately stated she hears noises, sees shadows and hears muffled phrases between people. (Dkt. No. 13 at 11 (citing AR 2134.[5]) The ALJ did not rely on the March 23, 2023 report but he did rely on Ms. Chambers' May 2, 2023 report which included the same history, of holding a knife, and complaints of hearing noises seeing shadows and hearing muffled phrases between people, regarding her mental health. (AR 2109-10.) Both Ms. Chambers reports noted no suicidal ideation after that. (AR 2109, 2143.) Contrary to

[5] The appropriate citation to the record also includes AR 2143-44.

Plaintiff's claim, the ALJ considered Plaintiff's mental health condition when assessing her RFC.

**3. Ambulation Requiring a Walker**

Finally, as to Plaintiff's ambulation requiring a walker, the ALJ determined "there is no indication in the longitudinal record that the [Plaintiff] either used a cane for ambulation or was prescribed an assistive device for ambulation by any treating physician aside from mobility during emergency department hospitalizations. (AR 30). This is consistent with hospital records indicating that while Plaintiff was provided with an assistive device during physical therapy evaluations, (AR 1672), while hospitalized, Plaintiff neared her functional baseline and could ambulate without an assistive device, (AR 1781). Contrary to Plaintiff's claim, the ALJ considered Plaintiff's history of falls and use of an assistive device during ER visits but found physical examinations from 2023 indicating that Plaintiff could "rise from a seated position without difficulty and unremarkable gait" and "was observed to ambulate without assistance" as most persuasive. (AR 21.) As such, the ALJ considered Plaintiff's ambulation in assessing her RFC. *See Sou v. Saul*, 799 F. App'x 563, 564 (9th Cir. 2020) (claimant "criticizes the ALJ for failing to 'evaluate this need [for a cane] or specifically reject it' in the RFC analysis. However, the ALJ did reference Sou's testimony regarding his use of a cane in its RFC analysis.").

Plaintiff neither presents a developed argument demonstrating that the ALJ failed to appropriately consider the combination of her impairments in determining her RFC. In this case, the ALJ considered Plaintiff's physical and mental impairments and reasonably concluded that Plaintiff had not submitted new and material evidence demonstrating additional functional limitations which would alter the RFC that was determined by the first ALJ. Accordingly, the Court concludes the ALJ's RFC assessment is supported by substantial evidence.

**D. Plaintiff's Subjective Testimony**

Plaintiff argues that the ALJ failed to reject Plaintiff's subjective symptom testimony with clear and convincing reasons. (Dkt. No. 13 at 15-17.) Defendant contends that the ALJ properly rejected Plaintiff's subjective complaints because medical evidence and her daily activities did not corroborate the severity of symptoms alleged. (Dkt. No. 16 at 6.)

An ALJ must undergo a two-step analysis to determine whether a claimant's testimony regarding subjective pain and other symptoms is credible. *Lingenfelter v. Astrue*, 504 F.3d. 1028, 1035-36 (9th Cir. 2007). First, the ALJ determines whether the claimant has presented objective medical evidence of an underlying impairment "which could reasonably be expected to produce the pain or other symptoms alleged." *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (*en banc*) (internal quotation marks omitted). When the claimant meets the first step and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of her symptoms "by offering specific, clear and convincing reasons for doing so." *Smolen v. Chater*, 80 F.3d 1273, 1281, 1284 (9th Cir. 1996); *see also Reddick*, 157 F.3d at 722 ("[g]eneral findings are insufficient."). The "specific, clear, and convincing" standard requires the ALJ to identify which part of the testimony is not credible and contradicts with which evidence. *Lambert v. Saul*, 980 F.3d 1266, 1277-78 (9th Cir. 2020). When taking Plaintiff's subjective testimony of her pain into account, "the ALJ is not 'required to believe every allegation of disabling pain, or else disability benefits would be available for the asking.'" *Molina v. Astrue*, 674 F.3d 1104, 1112 (9th Cir. 2012) (citation omitted). Where, as here, the ALJ points to specific evidence undermining a plaintiff's complaints, reversal or remand by a reviewing court is inappropriate. *Thomas v. Barnhart*, 278 F.3d 947, 959 (9th Cir. 2002).

The decision "must contain *specific reasons* for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to . . . any subsequent reviews the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015) (emphasis in original) (quotations omitted). While "an ALJ may not reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain . . . it is a factor that the ALJ can consider in his credibility analysis." *Burch*, 400 F.3d at 1231. The ALJ "[m]ay consider a range of factors in assessing credibility, including (1) 'ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.'" *Ghanim*, 763 F.3d at 1163 (quoting *Smolen*, 80 F.3d at 1284).

Plaintiff summarily argues that the ALJ failed to provide clear and convincing reasons to discredit her statements and failed to cite to the record or the citations he provides do not relate to his findings; therefore, she contends his findings are not supported by substantial evidence. (Dkt. No. 13 at 17.) Contrary to Plaintiff's claim, the ALJ did not merely state the Plaintiff's alleged greater functional limitations were not consistent with the medical evidence but provided seven reasons with numerous supporting citations to the record explaining why Plaintiff's statements about the intensity, persistence and limiting effects of her symptoms are not consistent with other evidence in the record. (AR 30-32.) The Court considers each in turn.

First, the ALJ concluded that Plaintiff's complaints of severe back pain consisting of radiating pain to the left leg with intermittent numbness was inconsistent with objective medical findings that her range of motion of the back was mildly decreased.

(AR 30.) She was also observed as having normal gait and balance and neurologically intact. (AR 30.) A neurology consultation for her back pain radiating down her left leg in June 2023 revealed her pain was intermittent. (2AR 3934.) During the exam, she rose to standing quite easily and walked with "normal base, stride length, cadence, arm swing and turns" and was able to toe and heel walk without difficulty. (AR 3939.) Her tandem gait was completed with some astasia-abasia. (2AR 3939.) An MRI of the lumbar spine taken in June 2023 showed "mild degenerative disc disease" at L5-S1 "with central annular fissure and disc protrusion contacting the traversing right S1 nerve root." (2AR 3935.) However, surgery was not required since the findings were relatively mild. (2AR 3941.) A June 2023 examination during a spine consult revealed no tenderness to palpation in the midline or over the paraspinal muscles with intact sensation to light touch in her lower extremity bilaterally and 5/5 motor strength in the bilateral lower extremities. (2AR 3945.) As such, the ALJ provided specific, clear and convincing reasons to reject Plaintiff's pain testimony concerning severe, debilitating back pain.

Second, as to her reported history of falls and her use of a walker due to pain and balance issues, as discussed above, the ALJ explained there was no longitudinal record that she used an assistive device for ambulation except in the context of mobility during ER hospitalizations. (AR 30.) For example, during her hospitalization in June 2023, she was using a walker on June 12, 2023 but then did not require a walker on June 13, 2023 when she was discharged. (2AR 2779.) Even though upon discharge on August 26, 2023, and again on October 10, 2023, her physical therapists recommended a walker to improve her stability and prevent falls, no treating physician prescribed an assistance device for ambulation. (2AR 2424, 3466.)

The Ninth Circuit and other district courts have applied the language of Social Security Ruling 96-6p:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device

> to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information).

SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996); *see Sou v. Saul*, 799 F. App'x 563, 564 (9th Cir. 2020); *Beatrice D. A. v. Kijakazi*, No. CV 22-01207, 2023 WL 3007921, at *4 (C.D. Cal. Apr. 19, 2023) ("Plaintiff's own testimony and mere references in treatment notes to her use of an assistive device are not enough to show medical need."); *Luis G. v. Saul*, No. ED CV 19-00317, 2020 WL 1433589, at *3 (C.D. Cal. Mar. 24, 2020) ("[T]he use of an assistive device is probative of a claimant's functional limitations only where it is medically required.") Plaintiff has not shown that her physician prescribed the use of a walker or other assistive device. Accordingly, the record contradicts Plaintiff's claim she needs a wheelchair and/or walker and the ALJ provided specific, clear and convincing reasons, including citing to the medical records rejecting Plaintiff's subjective pain testimony. *See Edimar P. v. Kijakazi*, Case No.: 3:20-cv-1069-AGS, 2022 WL 827128 (S.D. Cal. Mar. 18, 2022) (ALJ's conclusion that the medical evidence does not support a finding that the claimant has continued to require any assistive devices for ambulation is supported by substantial evidence); *Perez v. O'Malley*, Case No. 2:23-cv-00396-JDP (SS), 2024 WL 1095762, at *4 (E.D. Cal. Mar 13, 2024) ("In finding that plaintiff did not always use a walking cane and had no prescription for an ambulatory aid, the ALJ identified sufficient grounds for rejecting Dr. Jawad's assistive device limitation as inconsistent with other evidence.").

Third, the ALJ considered the inconsistent reasons why Plaintiff stopped taking her pain medication. (AR 30.) "[A]n unexplained, or inadequately explained, failure to . . . follow a prescribed course of treatment" can discredit pain allegations. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989); *see also* SSR 16-3P, 2017 WL 5180304 (Oct. 25, 2017) (If a claimant "fails to follow prescribed treatment that might improve systems, [the ALJ] may find the alleged intensity and persistence of an individual's symptoms are

inconsistent with the overall evidence of record. [The ALJ] will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment. . . .); *Tommasetti,* 533 F.3d at 1039-40 (explaining ALJ may consider fact that claimant failed to follow a course of treatment in making adverse credibility determination). "While there are any number of good reasons for not [following a prescribed course of treatment] . . . a claimant's failure to assert one, or a finding by the ALJ that the proffered reason is not believable, can cast doubt on the sincerity of the claimant's pain testimony." *Fair*, 885 F.2d at 603. Good reasons for not following a prescribed course of treatment include lack of funds or insurance coverage and adverse side effects from medications. *See Trevizo v. Berryhill*, 871 F.3d 664, 681 (9th Cir. 2017) (claimant's lack of funds for treatment cannot be basis to deny disability benefits); *Carmickle v. Comm'r, Social Sec. Admin*., 533 F.3d 1155, 1162 (9th Cir. 2008) (adverse side effects and pain medication not covered by insurance not a proper basis to find claimant not credible).

At various visits with medical providers, Plaintiff provided different reasons why she does not use pain medication. For instance, she stated she does not like how they make her feel, did not take Dilaudid, a narcotic pain medication, because she was afraid to take it while at home by herself, did not take opioids because it caused her nausea and vomiting to worsen, and she stopped pain medications due to tremors. (AR 1060, 1615; 2AR 2283, 4283.) The ALJ's reliance on Plaintiff's inconsistent reasons for not taking her narcotics are not clear and convincing reasons because even though the reasons varied, all relate to her concerns about the adverse effects from these medications and cannot be used to find her not credible. *See Carmickle*, 533 F.3d at 1162. Moreover, Plaintiff was prescribed a number of different types of pain medication; therefore, that could explain the different reasons she provided for why she stopped taking certain ones.

The ALJ also noted that Plaintiff had a history of not complying with her prescribed medications which is supported by the record. (AR 31.) On October 12, 2022, Plaintiff reported that she stopped taking her endometriosis medications for a period of nine months. (2AR 2565.) In May 2023, even though she stated psychotropic medication makes her feel better, (AR 2109), on October 5, 2023, during a hospitalization, she reported that she was not on psychotropic medication. (2AR 2326.) Plaintiff's reported failure to take her prescribed medication, in particular with regards to her endometriosis, one of the primary causes for her severe abdominal pain, for nine months, without any explanation, was a specific reason the ALJ determined why her pain testimony was not credible.

Fourth, the ALJ found the record showed she is able to care for her daily hygiene, drives her car when she can and has good to fair relationships with her family and friends although she reported that her mother managed her funds. (AR 31.) She also attended online school during the period at issue and traveled to visit her sister in Atlanta. (AR 31.) The ALJ commented that these activities suggest Plaintiff would be able to perform work activity according to the restrictions in her RFC. (AR 31.)

An ALJ may rely on a claimant's daily activities in discounting symptom testimony. *Orn v. Astrue*, 496 F.3d 625, 639 (9th Cir. 2007) (daily activities may be used to discount subjective complaints where the daily activities "contradict [her] other testimony" or "meet the threshold for transferrable work skills"); *see also Ghanim*, 753 F.3d at 1165 ("Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination."); *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) (daily activities have bearing on a claimant's credibility where the "level of activity [is] inconsistent with the Claimant's claimed limitations"). Daily activities may be "grounds for an adverse credibility finding 'if a claimant is able to spend a substantial part of his day engaged in pursuits involving the performance of

physical functions that are transferable to a work setting.'" *Orn*, 495 F.3d at 639 (quoting *Fair*, 885 F.2d at 603).

Here, the record shows Plaintiff attended online school during 2023, (AR 2157) and she testified she visited her sister across the country in Atlanta in 2022. (AR 61-62.) She testified that when she went to Atlanta, she and her sister pretty much stayed in her sister's room for most of the time due to the rain but also due to her pain. (AR 62-63.) While evidence of Plaintiff's activities is not, by itself, compelling evidence of her ability to engage in sustained work activity, in the context of the record in this case which included complaints of constant pain severely limiting Plaintiff's ability to walk, sit or stand, the ALJ provided clear and convincing reasons that Plaintiff's ability to engage in the daily activities, including attending online school and traveling across country suggest that she is more capable than the severe symptoms and limitations which she claimed prevent her from working. Accordingly, the ALJ properly discounted Plaintiff's subjective statements and testimony based on her admitted activities as they were not consistent with her claim of debilitating condition. *See Molina*, 674 F.3d at 1113 ("Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment."); *Berry v. Astrue*, 622 F.3d 1228, 1234-35 (9th Cir. 2010) (evidence that claimant's self-reported activities suggested a higher degree of functionality than reflected in subjective symptom testimony adequately supported adverse credibility determination); *Tonapetyan v. Halter*, 242 F.3d 1144, 1148 (9th Cir. 2001) (ALJ may use inconsistencies between a claimant's testimony and his or her other statements, conduct, and daily activities as a basis for discounting his or her testimony).

Fifth, the ALJ considered Plaintiff's mental impairments and noted that despite her reported symptoms of depression, anxiety, instances of passive suicidal ideation, homicidal ideation and hallucinations, the clinical findings did not support her reported

symptoms. (AR 31.) In fact, they were mostly unremarkable. (AR 2110; 2AR 2282.) In a report dated May 2, 2023 by Ms. Chalmers, Plaintiff was engaged, oriented to person, place, time and situation, casually dressed and groomed, had goal directed thought process, had fair insight and judgment without any suicidal, homicidal, or hallucinations. (AR 2110.) On October 23, 2023, on a visit with Dr. Shane Paul Castro, M.D., Plaintiff reported she had feelings of guilt, anhedonia, and anergia but she denied any suicidal and homicidal ideations. (2AR 2283.) But she endorsed chronic auditory and visual hallucinations about once or twice a month at night. (2AR 2282.) Dr. Castro noted she had appropriate appearance, was engaged, good eye contact, cooperative, had logical thought process with intact judgment, and impulse control and had no suicidal or homicidal ideations. (2AR 2288.) He noted her chronic psychotic symptoms are well controlled and was still in differential diagnosis as she is a poor historian. (2AR 2289.) As such, the ALJ provided clear and convincing reasons rejecting her subjective pain testimony.

Sixth, as to Plaintiff's auditory and/or visual hallucinations, the ALJ found that there was no evidence that any treating or examining physician ever observed her responding to internal stimuli of any kind. (AR 31.) An ALJ errs by rejecting Plaintiff's credibility by selectively picking days where she does not experience her mental health symptoms. *See Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014) (claimants who suffer from mental conditions may have symptoms that wax and wane, with downward cycles, cycles of improvement, and mixed results from treatment and an ALJ errs by picking out a few isolated instances of improvement). Here, the ALJ improperly rejected Plaintiff's subjective pain testimony because her auditory and visual hallucinations were not exhibited during any exam. Moreover, the Court notes that because she reported that some of her hallucinations occurred at night, (2AR 2325, 2282), it would be unlikely they would been exhibited during a day time visit with a physician. On this sixth reason, the

ALJ did not provide clear and convincing reasons to reject Plaintiff's reported debilitating condition.

Lastly, the ALJ considered her reported memory problems, difficulty concentrating and completing a task but noted she adequately completed the function report with detailed information about her alleged limitations and a work history report with no indication she required any help completing either form. (AR 31.) She also completed the psychiatric consultative examination and attended online college during the relevant period and only stopped attending due to pain. (AR 31-32.) The ALJ also determined based on the record that Plaintiff has a moderate, not marked, limitation in remembering and applying information and a moderate, not marked, limitation in concentration, persistence and maintaining pace. (AR 22-23.) As such, the ALJ provided clear and convincing reasons why her memory problems and concentration difficulties are not as severe as she reported.

In all, the Court concludes that one and a half reasons out of the seven reasons the ALJ provided to support his adverse credibility determination are invalid. Therefore, the Court must assess whether the ALJ's reliance on these invalid reasons was harmless error. *See Carmickle*, 533 F.3d at 1162. "So long as there remains 'substantial evidence supporting the ALJ's conclusions on . . . credibility' and the error 'does not negate the validity of the ALJ's ultimate [credibility] conclusion,' such is deemed harmless and does not warrant reversal." *Id.* (quoting *Batson v. Comm'r of Soc. Sec. Admin*., 359 F.3d 1190, 1197 (9th Cir. 2004)). In other words, "the relevant inquiry . . . is not whether the ALJ would have made a different decision absent any error . . . it is whether the ALJ's decision remains legally valid, despite such error." *Id.*

The ALJ's decision that Plaintiff's statements about the intensity, persistence and limiting effects of her symptoms were not credible is still supported. Even though he rejected her subjective testimony about auditory and visual hallucinations because they

were not presented during any examination she had with a physician, the ALJ did not wholly reject her claims as he considered them when assessing her RFC. (AR 29-30.) He recognized Plaintiff's mood disorder, depression and reported paranoia, visual and auditory hallucinations and considered them as part of the RFC where he limited her to "simple, routine, repetitive tasks, with breaks every two hours, no interaction with the general public, and occasional contact with co-workers and supervisors in a low-stress environment." (AR 29-30.) Further, even though the ALJ improperly rejected Plaintiff's credibility because she provided inconsistent reasons for stopping her pain medications, her noncompliance with prescribed medication was a clear and convincing reason supporting the ALJ's decision. Therefore, the invalid reasons were harmless errors.

The ALJ must resolve determinations of credibility, conflicts in medical testimony, and all other ambiguities. *Batson*, 359 F.3d at 1196; *Magallanes*, 881 F.2d at 750. In this case, the ALJ considered the full record and his decision is supported by substantial evidence. "Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld." *Burch*, 400 F.3d at 679; *see also Brown-Hunter*, 806 F.3d at 492 ("[W]e leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record.") (citation and internal quotation marks omitted); *Molina*, 674 F.3d at 1111 ("[W]hen the evidence is susceptible to more than one rational interpretation, we must uphold the ALJ's findings if they are supported by inferences reasonably drawn from the record."). The Court will uphold the ALJ's rational interpretation of the evidence in this case.

**E. Step Five**

Plaintiff asserts the ALJ improperly relied on the prior VE's testimony and did not provide her the opportunity to question the VE about whether she could perform jobs that exist in the national economy considering her need for a walker and need for breaks due to her "psychotic breaks." (Dkt. No. 13 at 14.) She also contends the ALJ did not update

the jobs available as it is questionable whether the three jobs identified by the former VE, laminator, table worker and assembler, still exist in significant numbers due to technology.[6] (*Id.*) Defendant responds that Plaintiff forfeited the step five issue by not having raised it during the administrative hearing and even if she had, the ALJ reasonably concluded Plaintiff could perform other work as supported by the prior VE's testimony. (Dkt. No. 15 at 4-5.)

At the fifth step, the second ALJ determined that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform and relied on the prior VE's testimony that Plaintiff would be able to perform the "representative occupations" of (1) laminator (DOT 690.685-258) with 66,100 jobs in the national economy; (2) table worker (DOT 739.687-182) with 3,880 jobs in the national economy; and (3) assembler (DOT 734.687-18), with 113,300 jobs in the national economy. (AR 35.)

Once a claimant establishes at steps one through four of the sequential evaluation process that she suffers from a severe impairment that prevents her from doing any work she has done in the past, she has made out a prima facie case of a disability. *See Tackett*, 180 F.3d at 1098. The burden then shifts to the Commissioner at step five to establish that the claimant can perform a "significant number[ ]" of jobs in the national economy given the claimant's physical and mental limitations, age, education, and work experience. 20 C.F.R. § 416.960(c)(2); *Thomas,* 278 F.3d at 955. The Commissioner can carry this burden through the testimony of a VE. *See Tackett*, 180 F.3d at 1100-01.

---

[6] Plaintiff argues that the ALJ failed to bear its burden at step five because the ALJ did not consider the combination of impairments that reflected all her limitations in the RFC. (Dkt. No. 13 at 13.) However, Plaintiff's argument is rendered moot based on the Court's conclusion that the ALJ considered all the impairments when determining the RFC.

Social security disability claimants must raise challenges to the accuracy of a VE's job-number estimates "at some point during administrative proceedings to preserve the challenge on appeal in federal district court." *Shaibi v. Berryhill*, 883 F.3d 1102, 1103 (9th Cir. 2017). In addition, "when claimants are represented by counsel, they must raise all issues and evidence at their administrative hearings in order to preserve them on appeal." *Meanel v. Apfel*, 172 F.3d 1111, 1115 (9th Cir. 1999) (holding that a claimant's failure to raise an issue "at both her hearing before the ALJ and the Appeals Council" constitutes forfeiture). Here, Plaintiff did not challenge, at the hearing or with the Appeals Council, the ALJ's decision not to call the VE at the hearing so she could question the VE about whether she could perform jobs that exist in the national economy considering her limitations and whether the jobs of laminator, table worker and assembler still exist in significant numbers due to technology. (*See* AR 43-73; AR 399-400.) Therefore, Plaintiff has forfeited both her challenges. However, even if she did not forfeit these challenges, they are, nonetheless, without merit.

An ALJ may adopt the vocational expert's opinions in a prior proceeding if material facts have not changed. *See Russell v. Astrue*, No. C07–2000–RAJ, 2008 WL 4542439, at *11 (W.D. Wash. Oct. 8, 2008) (ALJ adopted vocational expert's testimony at a prior hearing because the RFC was the same as the prior decision); *cf., Kind v. Barnhart*, 130 Fed. App'x 99, 101 (9th Cir. Mar. 22, 2005) (ALJ could not adopt prior VE's opinions because the claimant's age category had changed since first proceeding). Here, because Plaintiff did not rebut the presumption of non-disability by demonstrating a greater disability, and her condition had not changed, the ALJ did not err in adopting the prior VE's opinions.

Next, the Ninth Circuit has characterized uncontradicted VE job-numbers testimony as "inherently reliable" and "ordinarily sufficient by itself to support an ALJ's step-five finding." *Ford v. Saul*, 950 F.3d 1141, 1160 (9th Cir. 2020) (citations omitted);

*Kilpatrick v. Kijakazi*, 35 F.4th 1187, 1192–93 (9th Cir. 2022) ("Indeed, a VE's expert opinion 'may count as substantial evidence even when unaccompanied by supporting data.'"). Here, Plaintiff does not challenge the job numbers in the national economy for laminator, table worker and assembler by providing any estimates as to how many laminator, table worker and assembler jobs existed in the national economy in 2024. *See e.g., White v. Kijakazi*, 44 F.4th 828, 830 (9th Cir. 2022) (reversing district court's summary judgment ruling in favor of Commissioner and remanding to ALJ to address the plaintiff's evidence of "vastly discrepant job-number estimates"). Because Plaintiff has not properly disputed the job-number estimates, the ALJ did not err in its Step Five analysis.[7]

**Conclusion**

For the foregoing reasons, the Court AFFIRMS the decision of the Commissioner. The Clerk of Court is directed to close the case.

**IT IS SO ORDERED.**

Dated: September 29, 2026

Hon. Gonzalo P. Curiel
United States District Judge

[7] In her reply, Plaintiff, for the first time, in a summary fashion, asserts that the SSA regulations as to Step Five changed in 2025 and thus, determinations made in 2020 do not comply with the 2025 regulations. (Dkt. No. 17 at 4.) Because Plaintiff raises a new issue in her reply, the Court declines to consider it. *See United States v. Romm*, 455 F.3d 990, 997 (9th Cir. 2006) ("[A]rguments not raised by a party in its opening brief are deemed waived."); *Cedano–Viera v. Ashcroft*, 324 F.3d 1062, 1066 n.5 (9th Cir. 2003) ("[W]e decline to consider new issues raised for the first time in a reply brief"). Notwithstanding that, Plaintiff has not identified what specific provision under Step Five was amended in 2025 and whether it would apply retroactively to Plaintiff's application submitted in 2022.